The United States District Court
Eastern District of Michigan
Southern Division

United States of America,

        Plaintiff,

                           No. 25-cr-20027

v.

                           Hon. Laurie J. Michelson

David Lee Verner,

        Defendant.

_____/

## DAVID VERNER'S SENTENCING MEMORANDUM

## I.    INTRODUCTION

David Verner lives in immense pain. He is physically unwell and suffers from chronic sciatic nerve damage in addition to an undiagnosed medical condition that makes it feel like he's being electrocuted, and like his blood isn't flowing. The simple act of walking is painful for Verner. In addition to his physical pain, Verner has also endured a life marked by poverty, violence, and death. Verner knows his conduct was serious and caused real harm. He is deeply remorseful, and ashamed that he stooped to such a low level. He recognizes that he needs ongoing help to cope with significant trauma that led to his inappropriate behavior.

1

This case arose as Verner was nearing the end of a 60-month federal sentence for a drug offense out of the District of Minnesota. He was sitting in Milan FCI, living each day in acute physical pain and with untreated PTSD. As his release date neared, he became more anxious, and more desperate. He felt he was owed a debt and wanted to recoup the money before going home. Rather than let the debt go, which is what he should have done, Verner allowed his emotions and pain to take over. His conduct –using threats to extort– was serious and harmed real people. There is no minimizing the harm Verner caused. Still, the forces underlying Verner's behavior are important: pain, mental illness, and the dehumanizing setting of prison created a storm within Verner that led him to act out.

As a result of his conduct, Verner was punished harshly by the BOP. He was on the cusp of going home, and the BOP took his good time away. Rather than be released, Verner served an additional 10-months in isolation (in the "Special Housing Unit"). From March 2024 to January 2025, Verner lived alone in a concrete cell, cut off from the world. In the SHU, he was prohibited from going outside, accessing commissary, or interacting with other inmates. He could not make a phone call or order paper and stamps for letters. He could not hear his daughters' voices, or even send or receive their letters. Mr. Verner described that experience as a "living nightmare."

2

Verner's experience in isolation and being indicted in this case has forced him to take a close look at himself. He understands that he needs treatment to unwind his trauma, including the loss of his mother and being the victim of violence. He also needs access to adequate medical care to treat his sciatic nerve damage and get a diagnosis and treatment for the troubling pain he feels throughout his veins.

Verner's physical pain and mental health are no excuse for his actions. These factors do, however, help explain why he failed to manage his emotions in prison. Probation contemplates a guideline range of 37 – 46 months' incarceration. The defense agrees with this calculation. By the time he is sentenced in this case he will have served just over 9 months in pretrial custody. Taking into account the ten months he spent in isolation, Verner has served nearly twenty months in custody as a result of his conduct.

Verner needs treatment in the community, and proper medical attention, not more time in prison. For these reasons, and those explained more fully in this memorandum, a sentence of time served would be "sufficient, but not greater than necessary," to achieve the goals of sentencing under § 3553(a).

## II.     SENTENCING CONSIDERATIONS

### a.     Mr. Verner's History and Characteristics

*Childhood: violence and survival*

Mr. Verner's story begins in one of America's most violent neighborhoods. He was born in 1981 and grew up in the Robert Taylor Homes on Chicago's South Side. This particular housing project was so dangerous that it was commonly described as a "warzone."[1] He was the youngest of eight children, and from the age of nine, he was caring for his bedridden mother and fending for himself. His father was absent, and his mother's declining health left him to navigate a world of poverty, addiction, and violence largely on his own.

He dropped out of school before reaching even the fifth grade. Lacking any kind of education or guidance, Verner joined a neighborhood gang that promised protection in a place where survival demanded it. His older brother, Vincent, one of the few male figures in Verner's life, was already a member. Vincent pulled him into that world, not out of malice, but under the misguided belief that he and Verner would be safer if they were in a gang.

---

[1] George Papajohn and William Recktenwald, *Living in a Warzone Called Taylor Homes*, CHICAGO TRIBUNE (Mar. 10, 1993) https://www.chicagotribune.com/news/ct-xpm-1993-03-10-9303190679-story.html

Sadly, after years of battling health problems, Verner's mother passed away when he was just fifteen years old. She was the only stable presence Verner had ever known, and her death hit him hard. After she passed, he moved in with his sister, Virginia, hoping for structure and a sense of belonging. But Virginia's home, already strained and overcrowded, didn't provide the haven he needed. Virginia suffered from alcohol addiction and was barely able to raise her own children. Rather than provide Verner stability and a loving space to grieve, Virginia's home was chaotic and unsupportive. Unsurprisingly, this environment compounded rather than ameliorated Verner's emotional pain.

Still just a teenager, Verner was parentless, effectively homeless, and desperate for a sense of belonging in the world. It is against this backdrop that he fully turned to the streets seeking refuge from the storm. And, though Verner did find some sense of place in the streets, street life brought with it a reign of terror that would permanently scar Verner in years to come.

_Pain and perseverance_

In 1999, at just eighteen, Verner was shot six times on his right side, back and neck as a consequence of gang violence. His treatment included a two-week hospital stay and multiple surgeries. A bullet remains lodged in his back. The injuries caused permanent sciatic-nerve damage and chronic pain that radiates

down his left leg. He was later stabbed while sleeping in jail and again shot in 2006.  While he has received medical treatment for his physical injuries, Verner has never received adequate mental health care. These injuries, and the untreated trauma that followed, created the conditions for his later heroin addiction.

Despite his pain and physical limitations, Mr. Verner has worked when he could, primarily in construction, to provide for his family. More than anything, Verner has always wanted, and tried his best, to give his children a better life than what he experienced growing up. His daughters, Daija (23) and Donita (20), are the center of his universe. Both still live in Chicago, and he continues to maintain close contact with them.

Mr. Verner has never received meaningful mental-health treatment despite living under the weight of trauma, pain and hypervigilance. His untreated PTSD and chronic trauma carry both psychological and physiological consequences. Studies link unresolved traumatic stress to increased risk of chronic medical conditions, poorer immune function, and higher mortality.[2] Research also suggests that chronic pain conditions are often associate with greater difficulty regulating anger and impulsivity: pain amplifies emotional reactivity, making it harder to

---

[2] Alexander C. McFarlane et al., *The Long-Term Costs of Traumatic Stress: Intertwined Physical and Psychological Consequences*, 9 *World Psychiatry* 3 (2010), PMC2816923, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2816923/

maintain self-control.[3] Verner's cumulative burden of trauma, unaddressed PTSD, and relentless nerve pain set the stage for the emotional dysregulation that led to his conduct in this case. More time in prison will only worsen Verner's condition. He needs holistic treatment in the community to address his physical and mental health.

_Freedom ripped away: a harsh lesson for Verner_

Mr. Verner acknowledges that this is not his first criminal case. He also recognizes that he is no longer a young man. Both of these things are true, and yet, Verner is still capable of change. Indeed, the 10 months of isolation he endured as a consequence of his actions impacted him more deeply than any prior sentence.

Before being indicted in this case he was serving a 60-month federal sentence in Milan FCI and was on the cusp of going home. He had banked his good time and was on track for release in or around March 2024. In the months leading up to that date, Verner could think of little other than the moment he would get to see his daughters again after having been away for so long. He was excited, but also anxious. How would he get his life back on track after being incarcerated

---

[3] Susanne Fischer et al., _Anger, Stress, and the Moderating Role of Pain: Insights from Chronic Pain Patients_, 15 _Frontiers in Psychology_ 1008 (2015), PMC4465351, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4465351/

for nearly five years?  This was a highly emotional time for Verner. Amidst this anxiety over his pending release, Verner became frustrated over a debt he believed he was owed. In pain from his medical problems, and overcome by emotion, Verner made the terrible decision to use threats in an attempt to extort the victims in this case.

He was so close to freedom, only to see it disappear as a result of his own stupid, impulsive behavior. He has only himself to blame. As a result of his actions, Verner lost the entire 10-months of good time he had accrued. And it wasn't just the loss of good time that hit Verner hard. He spent those ten-months in isolation, where he was locked in his cell for twenty-three hours a day, released for only one hour, alone in a small recreation cage. He could not make phone calls, write or receive letters, or have any contact with his family or other inmates.

Verner believed he was about to reunite with his family a free man. To go from that to 10-months of isolation and then face an additional federal case was shocking. This shock, above any prior punishment he's experienced, prompted Verner to take a careful look at himself and the consequences of his actions. Verner has spent his time in pretrial custody reflecting on the root causes driving his behavior. He has also reflected on the many ways his actions harmed others. Verner deeply regrets his terrible decision-making and is ashamed of his behavior.

*Moving forward*

On release from prison, Verner plans to move back to Chicago where he will

live with family. The attached letters of support show that David is loved and will

have a support network upon his return home.  Ex. A – Support Letters.

### b.      Nature of the Offense

Verner made threatening statements in a futile attempt to collect a debt that

he believed he was owed. Verner acknowledges that his actions were wrong, and

he makes no excuse for his conduct. Verner recognizes that his behavior was

impulsive, threatening, and that he needs medical treatment to address his

underlying physical and mental health problems.

### c.      Seriousness of the Offense, Punishment, and Deterrence

This is a threats case involving Verner's fellow-inmate, V1, and V1's wife

and daughter. It is a serious offense. The seriousness of this offense was

sufficiently addressed by the 10 months Verner spent in isolation followed by the 9

months he's spent in pretrial custody. "American prison life is built upon the

dehumanizing rituals of induction, initiation, hierarchy, degradation and routine, all

designed to assert authority and control over the bodies and lives of incarcerated

people. Individuality is stripped away upon prison entry, replaced by an inmate number and a standardized, nondescript uniform."[4]

Isolation is a particularly harsh form of punishment. Psychologists and physicians have long recognized that isolation produces predictable patterns of psychological and physical deterioration. Dr. Craig Haney, who has studied hundreds of prisoners in solitary confinement, observed that people in isolation "begin to lose the ability to initiate behavior of any kind—to organize their own lives around activity and purpose," leading to "chronic apathy, lethargy, depression, and despair."[5]

People aren't meant to be isolated. "[W]ithout sustained social interaction, the human brain may become as impaired as one that has incurred a traumatic injury."[6] Senator John McCain, who endured years of solitary confinement as a

---

[4] Ram Subramanian, "How Some European Prisons Are Based on Dignity Instead of Dehumanization," *Brennan Center for Justice*, November 29, 2021, accessed October 8, 2025, https://www.brennancenter.org/our-work/analysis-opinion/how-some-european-prisons-are-based-dignity-instead-dehumanization
[5] Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 Crime & Delinq. 124, 131–32 (2003).
[6] Atul Gawande, *Hellhole: The United States Holds Tens of Thousands of Inmates in Long-Term Solitary Confinement. Is This Torture?*, *The New Yorker* (Mar. 30, 2009), https://www.newyorker.com/magazine/2009/03/30/hellhole.

prisoner of war, described it simply: "It crushes your spirit and weakens your resistance more effectively than any other form of mistreatment."[7]

Mr. Verner's experience mirrors what the literature predicts. The ten months he spent in isolation were the most punishing experience of his life. For a man in his mid-forties, already suffering from chronic pain and depression, that additional time was crushing. The time he spent in isolation sufficiently reflects the seriousness of this offense. Mr. Verner is not in need of further confinement. He needs treatment, stability, and a chance to rebuild.

Further incarceration also won't promote deterrence. Punishment is meant to deter both the individual defendant and others,[8] however, research consistently shows that longer prison sentences do not deter future crime and may even have the opposite effect. [9] The U.S. Sentencing Commission found "no difference between the recidivism rates for offenders who were released early due to retroactive application of the [Fair Sentencing Act] Amendment and offenders who had served their full sentences before the FSA Guidelines Amendment reduction retroactively took effect." [10] A comprehensive meta-analysis reached the same

---

[7] *Id*.
[8] See Richard S. Frase, *Punishment Purposes*, 58 Stan. L. Rev. 67, 70-71 (2005).
[9] Nat'l Inst. Justice, *Five Things About Deterrence* (May 2016).
[10] U.S. Sentencing Comm'n, *Recidivism Among Federal Offenders Receiving Retroactive Sentence Reductions* (2018).

conclusion: "custodial sanctions have no measurable deterrent effect and may slightly increase reoffending compared with noncustodial sanctions such as probation." [11] Consequently, "[i]ncarceration cannot be justified on the grounds it affords public safety by decreasing recidivism." *Id.*

Given Mr. Verner's prior custodial sentences, it is unclear what benefit further incarceration could bring. Every report in this record tells the same story: Mr. Verner is a man with chronic physical pain and inadequately treated trauma. Verner needs mental-health treatment, pain management, and supportive supervision—not another stretch in federal custody. That is where Mr. Verner stands a chance of rebuilding his life and continuing to work on anger management and emotional control, insights he has already begun to internalize.

## III.    CONCLUSION

Mr. Verner has lived most of his life in survival mode. He has known poverty, violence, injury, addiction, and loss. The seriousness of his conduct is not lost on Verner. The BOP punished him severely for his actions prior to being indicted.

---

[11] Petrich et al., *Custodial Sanctions and Reoffending: A Meta-Analytic Review,* 50 Crime & Justice 353 (2021)

The time Verner spent in isolation followed by a whole new federal indictment and pretrial detention have forced Verner to contemplate the factors driving his actions, and what he needs to do to manage his emotions going forward.  For these reasons, a sentence of time served is both just and sufficient, but not greater than necessary, to comply with 18 U.S.C. § 3553(a).

Respectfully submitted,

/s/ *Keshava A. Kirkland*
/s/ *Elizabeth Young*
Attorneys for David Verner
613 Abbott Street, 5th Floor
Detroit, MI  48226
(313) 967-5542
keshava_kirkland@fd.org

Dated: October 9, 2025

The United States District Court
Eastern District of Michigan
Southern Division

United States of America,

       Plaintiff,

                              No. 25-cr-20027

v.

                              Hon. Laurie J. Michelson

David Lee Verner,

       Defendant.

_____/

## **CERTIFICATE OF SERVICE**

    I certify that I electronically filed the foregoing paper on October 9, 2025 via CM/ECF, which will send notification to all parties of record.


/*s/ Keshava Kirkland*